UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------X

MOHAMED BARY,

        Plaintiff,                <u>MEMORANDUM AND ORDER</u>

  -against-                 Civil Action No.
                                        CV-02-5202(DGT)

DELTA AIRLINES, INC.,

        Defendant.

--------------------------------X

Trager, J:

    Mohamed Bary ("plaintiff") brings this action against Delta Airlines, Inc. ("defendant" or "Delta"), alleging that the air carrier discriminated against him, in violation of 42 U.S.C. § 1981 ("Section 1981"), Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI") and the New York Civil Rights Law ("NYCRL"), when it prevented him from carrying his bag onto a Delta flight. Plaintiff also seeks relief, under state law theories of negligence and bailment, for the jewelry he alleges was missing from the bag when he went to collect it after Delta forced him to check the bag. Defendant has moved for summary judgment on all of plaintiff's claims. For the reasons set forth below, defendant's motion is granted in part and denied in part.

**Background**

**(1)**

Plaintiff is a former resident of Sri Lanka who identifies himself as a Muslim Arab.  Dep. of Mohamed Bary ("Bary Dep.") at 113.  While living in Sri Lanka, plaintiff was in the jewelry business and transported jewelry into the United States on numerous occasions.  Id. at 13-15.  He moved to the United States in September 2000 in order to improve this business.  Id. at 10-11.  Here, he incorporated Bary Gems, Inc., of which he is the current owner and sole proprietor.  Def.'s Statement Pursuant to Local Rule 56.1 ("Def.'s 56.1") ¶ 4; Bary Dep. at 20-21.

On November 8, 2001, plaintiff was a ticketed passenger on a Delta flight from LaGuardia Airport ("LaGuardia") to Denver, with a stop in Cleveland.  Def.'s 56.1 ¶ 1.  He purchased the tickets for his original flight through the Priceline.com website.[1]  Bary Dep. at 78.  The purpose of the trip was to attend an international gem and jewelry trade show where plaintiff hoped to sell some of his jewelry.  Id. at 24, 89-90; Def.'s 56.1 ¶ 3.  Plaintiff generally traveled to 25 or 30 similar trade shows each year.  Bary Dep. at 24-25.

For his trip to Denver, plaintiff had packed two bags, one

---

[1] As discussed infra, at his request, plaintiff ended up taking an earlier flight.  Specifically, he was transported on Delta Flight 405 from LaGuardia to Cleveland, after which he connected to Delta Flight 1497 from Cleveland to Denver.

2

containing clothes, which he planned on checking in, and the other containing gems and jewels, which he expected to carry onto the plane (hereinafter, the "merchandise bag"). Id. at 75. He placed a lock on the merchandise bag to ensure that its contents would be secure. Id. at 76. The gems and jewels contained in the merchandise bag were comprised mostly of items that plaintiff had obtained from several different vendors on a consignment basis. Id. at 25-27, 62-66. In other words, much of the gems and jewels in the merchandise bag were not actually owned by plaintiff, but were loaned to him by vendors who expected that the jewelry would either be returned to them or that plaintiff would sell the jewelry and then pay them a certain price. Id. at 27.

Having arrived early for his originally scheduled flight, plaintiff approached the Delta ticket counter to inquire about taking an earlier flight. Id. at 81. He was greeted at the counter by Vera Hall, a Delta customer service agent. Bary Dep. at 81-82; Dep. of Vera Hall ("Hall Dep.") at 6. Plaintiff presented his ticket to Hall, who then looked up his record on her computer. Bary Dep. at 81. Hall informed plaintiff that he was on a "random checklist," which required that his bags be hand-searched. Id. at 82-83, 104. She asked that plaintiff accompany her to a search area, which was located to the right of the ticket counter. Id. at 83, 93. Plaintiff followed Hall

3

without protest.  Id. at 83-84.

At the search area, plaintiff informed Hall that the merchandise bag contained jewelry and that although he did not mind having it searched, he wanted to carry the bag on the plane with him.  Id. at 84-85.  Hall then returned to her station at the ticket counter.  Id. at 85.  A security officer proceeded to look through plaintiff's merchandise bag, inspecting each item individually.  Id. at 85, 87.  Hall later returned with a baggage tag.  Id. at 88.  The security officer continued searching through the merchandise bag with Hall present.  Id. at 89. Plaintiff, therefore, claims that Hall saw what was inside the merchandise bag.  Id. at 89, 91.  Plaintiff also explained to the security officer that he was on his way to a gem and jewelry trade show.  Id. at 89-90.  Once the security officer finished looking through the merchandise bag, plaintiff, once again, secured it with a lock.  Id. at 92.  Hall then placed a tag on the merchandise bag.  Id. at 90.  The security officer completed the search by briefly looking through plaintiff's clothing bag. Id.

After both bags had been searched, Hall told plaintiff that he would not be permitted to carry the merchandise bag on board.[2] Id. at 90.  Plaintiff was, therefore, forced to check both of his

---

[2] Hall did not explain to plaintiff why he could not carry his bag onto the plane.

4

bags, despite having made it clear to Hall that he wanted to
carry the merchandise bag on the plane with him.  Id. at 90, 127.
In return, Hall presented plaintiff with two baggage tag
receipts.[3]  Id. at 125-27.  When plaintiff asked Hall why other
passengers were permitted to carry their bags onto the plane,
Hall explained that Delta had discretion to decide who could
carry baggage onto the plane.  Id. at 90-91, 94.  Plaintiff
alleges that he was the only passenger who was not permitted to
bring his bags on board.  Id. at 113-14, 123-24.  He further
asserts that his merchandise bag met Delta's carry on size
requirement.  Id. at 107.

The merchandise bag was the same bag in which plaintiff
generally carried his jewelry when he traveled to trade shows.
Id. at 70, 77.  According to plaintiff, he had never before been
prevented from carrying his merchandise bag on board prior
flights with any airline.  Id. at 77.

### (2)

Delta's version of the events is different in certain
critical aspects.  Hall admits that she was aware that plaintiff

---

[3] It is not entirely clear at what point plaintiff received
his boarding pass.  At his deposition, he testified that Hall
gave him his "ticket" only "after this incident."  Bary Dep. at
81.  The term "after this incident" could refer either to the
time period immediately after plaintiff's bags were searched or
after Hall informed plaintiff that he could not carry his
merchandise bag on board the plane.

only wanted to check in one piece of luggage.  Hall Dep. at 37-
38, 40.  Accordingly, she generated only one baggage tag.  Id. at
38.  That tag, however, indicated that plaintiff was designated
as a "selectee."  Id. at 38.  Hall's understanding was that
anyone designated as a "selectee" had to have his bags hand-
searched and could not carry bags onto the plane.  Id. at 38.
Hall did not offer any explanation as to the basis of this
belief.  She, therefore, generated a second tag, and explained to
plaintiff why he would be unable to bring his merchandise bag on
board.  Id.

     According to Hall, plaintiff informed her that the reason he
did not want to check in the merchandise bag was because it
contained jewelry.  Id. at 40-41.  He also told Hall that,
because of the bag's contents, he did not want it opened in front
of a large group of people.  Id. at 24.  Hall then left the
counter to inform her supervisor, James Wlodarczyk, that a
passenger was refusing to have his bag searched.  Id. at 41.
Hall claims to have no knowledge of what transpired after
Wlodarczyk took control of the situation.  Id. at 26.

     According to Wlodarczyk, once it became clear that plaintiff
was a jeweler, he agreed to perform a more private search, as per
Delta's established procedure for dealing with individuals who
were transporting valuables.  Wlodarczyk Dep. at 15, 30-31.  The
hand-search was, therefore, performed in a completely enclosed

area behind a drawn curtain. Id. at 17, 43. The only
individuals that Wlodarczyk claims were present at the search
were himself, plaintiff, a security supervisor and the individual
who actually conducted the search. Id. at 17. Additionally,
Wlodarczyk testified that the merchandise bag was the only bag
searched. Id. at 23, 31-32. According to Wlodarczyk, once the
search was completed and it was determined that the bag did not
contain any hazardous material, plaintiff was not prevented from
carrying the merchandise bag onto the plane. Id. at 21, 29.
Wlodarczyk specifically recalls watching plaintiff make his way
to the gate with the merchandise bag in his hand. Id. at 21, 31.

### (3)

Plaintiff boarded his flight and was transported to Denver
with no further delays. Bary Dep. at 110. He arrived in Denver
at approximately 4:00 pm. Id. at 133. After landing, plaintiff
collected his two checked bags from baggage claim, but did not
open the merchandise bag at that time. Id. at 128-29. The
merchandise bag was still locked and it appeared not to have been
opened since being hand-searched at LaGuardia. Id. at 129.
Plaintiff then ran into M.S. Shafi, a dealer who was also
attending the trade show. Id. at 131. Shafi, who had rented a
car, drove plaintiff and himself to the Merchandise Mart, where
the trade show was set to take place. Id. at 130-33. Plaintiff

7

then prepared his display, but still did not open the merchandise bag.  Id. at 133, 136.  Plaintiff and Shafi then drove to the hotel where they were both staying.  Id. at 136.

It was only the following morning, November 9, 2001, when plaintiff was placing the actual sale items on display, that he discovered that two pouches containing jewels and a box holding rings were missing from the merchandise bag.  Id. at 132.  While still in Denver, plaintiff called Delta's toll-free number to determine the procedure for reporting the missing items.  Id. at 141-42.  He was instructed to prepare a written claim, which he submitted to Delta on November 20, 2001.  Id. at 142-43.  Plaintiff attached, to his written claim, a three-page list of items that he believed were missing, and estimated their value at $373,186.81.  Id. at 143.

Plaintiff remained in Denver for the duration of the three-day trade show and then flew back to New York.  Id. at 163.  He reported the lost items to the Denver airport police while departing from Denver International Airport.  Id. at 165.  He also appears to have reported the stolen items to the police at LaGuardia.  See id. at 162-63.  Additionally, plaintiff wrote two letters to Delta concerning the loss of the jewels - one on November 18, 2001 and another on December 3, 2001.  Id. at 117-20.  Plaintiff did not accuse Delta of discrimination in either letter.  Id. at 117-19.

8

(4)

Delta submitted an affidavit from its in-house counsel affirming that Delta's domestic tariff ("Delta's tariff") was "published" pursuant to its business practice.  Aff. of David A. Seiler ("Seiler Aff.") ¶ 3.  According to the affidavit, the version of Delta's tariff that was in effect on November 8, 2001 listed jewelry among the "items considered unacceptable for transportation in checked baggage with/without carrier's knowledge."  Exhibit to Seiler Aff. ("Delta's Domestic Tariff").  Furthermore, Section J(1)(A) of Delta's tariff limited its liability for the loss of "baggage or other property" to $2,500:

> [L]iability, if any, for the loss . . . of a fare-paying passenger's baggage or other property (whether checked or otherwise delivered in to the custody of [Delta]), shall be limited to an amount equal to the value of the property, plus consequential damages, if any, and shall not exceed the maximum limitation of USD 2500.00 for all liability for each fare-paying passenger (unless the passenger elects to pay for higher liability as provided for in paragraph 3) below).  The passenger shall not be automatically entitled to USD 2500.00 but must prove the value of losses or damages.

Id.; see also Def.'s 56.1 ¶ 9.

Additionally, Section J(2)(F) of Delta's tariff excluded liability for jewelry unless excess insurance was purchased:

> [Delta] is not responsible for jewelry, cash, camera equipment, or other similar valuable items contained in checked or unchecked baggage, unless excess valuation has been purchased.  These items should be carried by the passenger.

Delta's Domestic Tariff (emphasis added).

9

Section J(3) of Delta's tariff permitted a passenger to declare a higher value for checked-in luggage by paying a fee:

> A passenger may, when checking in for a flight and presenting property for transportation, pay an additional charge . . . and declare a value higher than . . . [certain specified] maximum amounts . . . in which event [Delta's] liability shall not exceed such higher declared value.

Id.

At his deposition, plaintiff claimed that on November 8, 2001 he was not aware that Delta's tariff excluded liability for jewelry or that he had the option of purchasing excess insurance. Bary Dep. at 73, 108.  In his December 3, 2001 letter to Delta, however, plaintiff wrote: "I know that the ticket contract covering my travel excludes responsibility for jewelry and gemstones not declared."  Id. at 120.  At his deposition, plaintiff explained that he only learned about the exclusion of liability for lost jewelry when he consulted with an attorney after the November 8, 2001 flight.  Id.

## (5)

Plaintiff filed the complaint in the present action on September 26, 2002.  On July 10, 2003, plaintiff filed an amended complaint striking out certain unrelated allegations.[4]  The

---

[4] On November 23, 2005, this matter was administratively closed due to a voluntary petition for relief filed by Delta with the Bankruptcy Court for the Southern District of New York.  An April 24, 2008 memorandum and order granted plaintiff's request

amended complaint alleges that defendant: (1) violated Section 1981, Title VI and the NYCRL by intentionally discriminating against plaintiff on the basis of race when it refused to allow him to carry on his merchandise bag and (2) was liable, under theories of negligence and bailment, for mishandling plaintiff's merchandise bag, causing certain items to be lost or stolen.

Defendant moves for summary judgment, arguing that: (1) plaintiff's Section 1981 and Title VI claims fail because plaintiff provides no evidence of defendant's intent to discriminate on the basis of race; (2) plaintiff's Title VI claim fails because the infusion of federal financing into the airline industry after the September 11, 2001 terrorist attacks does not constitute "Federal financial assistance"; (3) plaintiff's NYCRL claim fails because an aircraft is not a place of public accommodation under the statute; (4) plaintiff's tort claims are preempted by the Airline Deregulation Act ("ADA") and, thus, Delta's tariff, which limits liability for lost personal items to $2,500, is the sole determinant of the parties' rights and responsibilities under the contract of carriage; and (5) even if Delta is liable for the loss of plaintiff's jewelry and the limitation of liability is found to be unenforceable, plaintiff's damages should be limited to $13,847.76, which is the total

---

to re-open this case finding that plaintiff's claims against Delta were not discharged.

amount that he paid the actual owners of the allegedly stolen
jewels and gems.

## Discussion

### (1)

### Summary Judgment Standard

Summary judgment should be granted "if the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c).  In deciding a summary judgment motion, a
court must determine "whether the evidence presents a sufficient
disagreement to require submission to a jury or whether it is so
one-sided that one party must prevail as a matter of law."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  In
making this determination, the court must "resolve all
ambiguities, and credit all factual inferences that could
rationally be drawn in favor of the party opposing summary
judgment."  Fitzgerald v. Henderson, 251 F.3d 345, 360 (2d Cir.
2001) (citing Anderson, 447 U.S. at 249).  A non-moving party's
"conclusory statements, conjecture, or speculation" are not
sufficient to defeat a motion for summary judgment.  Kulak v.
City of New York, 88 F.3d 63, 71 (2d Cir. 1996).  Instead, the
non-moving party must present specific facts sufficient to

establish that there is a genuine factual issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

(2)

**Federal Financial Assistance Under Title VI**

Defendant argues that because Delta is not a recipient of federal financial assistance, a prerequisite to liability under 42 U.S.C. § 2000d, it is entitled to summary judgment on plaintiff's Title VI claim.  Title VI prohibits discrimination "under any program or activity receiving Federal financial assistance."[5]  42 U.S.C. § 2000d.  The Supreme Court has found that Title VI "condition[s] an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of [federal] funds."  Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 289 (1998); Soberal-Perez v. Heckler, 717 F.2d 36, 41 (2nd Cir. 1983) (noting the "emphasis [placed] upon

---

[5] Specifically, Title VI provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d. Like a claim brought under Section 1981, in order to establish a claim under Title VI, a plaintiff must demonstrate: (1) that the defendant discriminated against her on the basis of race; (2) that the discrimination was intentional; and (3) that the discrimination was a "substantial" or "motivating factor" for the defendant's actions.  Tolbert v. Queens Coll., 242 F.3d 58, 69 (2d Cir. 2001).

the contractual nature of the receipt of federal moneys [under Title VI] in exchange for a promise not to discriminate . . . ."). Defendant acknowledges that it received funding from the federal government pursuant to the Air Transportation Safety and System Stabilization Act of 2001, Publ. L. No. 107-42, 115 Stat. 230 (2001) (codified as amended 49 U.S.C. § 401010) (the "Stabilization Act"). It argues, however, that the receipt of these funds does not subject it to liability under Title VI because such compensation does not qualify as "Federal financial assistance" under 42 U.S.C. § 2000d.[6] There is no Second Circuit case law on this issue.

In support of its argument, defendant cites to an Eleventh Circuit decision, Shotz v. Am. Airlines, Inc., 420 F.3d 1332 (11th Cir. 2005). Shotz involved an action brought pursuant to the Rehabilitation Act alleging disability discrimination. Id. at 1334. Like Title VI, the receipt of "Federal financial assistance" is a pre-requisite to liability under the Rehabilitation Act. See 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or

---

[6] In his complaint, plaintiff alleges that "Defendant is the recipient of federal financial assistance," but never specifies the exact source or purpose of that funding. Pl.'s Am. Compl. ¶ 32.

14

be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."). The plaintiffs in Shotz, like plaintiff here, argued that the air carrier defendants were subject to the Rehabilitation Act because the aid that they received from Congress pursuant to the Stabilization Act qualified as "Federal financial assistance."

The Eleventh Circuit disagreed, holding that, in passing the Stabilization Act, the express language of the statute makes clear that Congress intended to provide compensation to the airline industry and not to subsidize it (i.e., provide it with financial assistance). Id. at 1136 ("Plainly, the express language found in the Stabilization Act unambiguously shows Congress intended for the funds and financial benefits at issue to compensate, not subsidize, airline carriers."). Specifically, "the Stabilization Act begins by stating 'the President shall take the following actions to compensate air carriers for losses incurred by the air carriers as a result of the terrorist attacks on the United States that occurred on September 11, 2001.'" Id. (quoting the Stabilization Act) (alteration in original). The court reasoned further that "it seems illogical to infer that, in passing the Stabilization Act in response to the enormous economic crisis the airline industry faced as a result of the September 11 terrorist acts, Congress also intended to expose airline carriers to additional economic risk by allowing private

15

lawsuits for damages to be brought under the Rehabilitation Act."
Id. at 1136.

The Eleventh Circuit's reasoning in Shotz applies equally to
an action under Title VI.  It is undisputed that an entity is
subject to liability under either the Rehabilitation Act or Title
VI only if it receives federal financial assistance.  Courts have
indicated that the definition of federal financial assistance is
the same under both Title VI and the Rehabilitation Act.  See
Jacobson v. Delta Airlines, Inc., 742 F.2d 1202, 1209 (9th Cir.
1984) ("The legislative history of the Rehabilitation Act . . .
indicates that those terms [including 'Federal financial
assistance'] were to be given the same meaning as the same terms
in . . . 42 U.S.C. § 2000d-1 (1982) (Title VI). . . ."); see
also Cook v. Budget Rent-A-Car Corp., 502 F. Supp. 494, 500
(S.D.N.Y. 1980) ("Not only does Section 601 contain language very
similar to that of Section 504 (including the crucial phrase
'Federal financial assistance'), but the 'legislative history' of
Section 504, such as it is, makes it clear that Section 504 was
patterned after, and intended to have a scope as broad as,
Section 601.").  Although the phrase "Federal financial
assistance" is not defined in the Rehabilitation Act, courts have
found that "an entity receives financial assistance when it
receives a subsidy," Nolley v. County of Erie, 776 F. Supp. 715,
742 (W.D.N.Y. 1991) (quoting DeVargas v. Mason & Hanger-Silas

16

Mason Co., 911 F.2d 1377, 1382 (10th Cir. 1990)), as opposed to

compensation.  As demonstrated by the Eleventh Circuit in Shotz,

the express language of the Stabilization Act evidences Congress'

intent to compensate airline carriers for losses sustained as a

result of the September 11 attacks and not to provide airlines

with a subsidy.  Plaintiff's opposition fails to even address

this argument.  There is also no indication that Delta received

any federal funding outside of the compensation it received

pursuant to the Stabilization Act.  Accordingly, plaintiff's

Title VI claim must be dismissed.[7]

_____

[7] Even if the compensation that Delta received pursuant to
the Stabilization Act was deemed to be a subsidy, plaintiff does
not have standing to bring suit under Title VI.  "In order to
establish standing to sue under [Title VI] plaintiffs must be the
intended beneficiaries of the federal spending program."  Scelsa
v. City Univ. of New York, 806 F. Supp. 1126, 1140 (S.D.N.Y.
1992); see also Coalition of Bedford-Stuyvesant Block Ass'n, Inc.
v. Cuomo, 651 F. Supp. 1202, 1208 n.2 (E.D.N.Y. 1987) (finding
that Title VI "does grant private parties the right to sue, but
only if they are either the intended beneficiaries of the federal
program or the discrimination that the plaintiffs are suffering
will negatively impact upon those intended beneficiaries").
There is nothing to indicate that plaintiff was an intended
beneficiary of the money that Delta received pursuant to the
Stabilization Act.

Furthermore, "[l]iability under Title VI . . . cannot be
imputed to institutions based on the actions of their employees."
Goonewardena v. New York, 475 F. Supp. 2d 310, 328 (S.D.N.Y.
2007).  Here, plaintiff seeks to hold Delta responsible for an
alleged discriminatory act perpetrated by one of its employees.
Plaintiff produced no evidence demonstrating that Delta itself
acted with the requisite intent by, for example, instituting
discriminatory policies or practices.  See id. (dismissing
plaintiff's Title VI claim against defendant educational
institution where plaintiff sought to hold the defendant liable
for the acts of its employees rather than alleging that the

17

**( 3 )**

**New York Civil Rights Law**

Plaintiff also alleges that defendant is liable under the NYCRL for discriminating against him in a public accommodation.[8] Defendant argues that plaintiff's NYCRL claim should be dismissed because an aircraft is not a place of public accommodation.[9] Section 40 of the NYCRL protects individuals from discrimination "on account of race, creed, color or national origin," requiring that all persons "be entitled to the full and equal accommodations . . . of any places of public accommodations."

---

defendant's policies or general practices were discriminatory, which would have demonstrated that the institution itself acted with the requisite intent to discriminate).

[8] "[T]he standards governing claims asserted pursuant to 42 U.S.C. § 1981 are identical to those for claims asserted pursuant to the . . . New York Civil Rights Law." Drayton v. Toys 'R' Us Inc., --- F. Supp. 2d ---, 2009 WL 2170233, at *10 (S.D.N.Y. July 17, 2009) (quoting Joseph v. New York Yankees P'ship, No. 00 Civ. 2275, 2000 WL 1559019, at *6 (S.D.N.Y. Oct. 13, 2000)).

[9] Defendant's argument focuses on the fact that an aircraft is not a place of public accommodation under 42 U.S.C. § 2000a. Pursuant to 42 U.S.C. § 2000a: "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a(a). The definition of the phrase "a place of public accommodation" under Section 2000a, however, is not the same as the definition of the term under the NYCRL. For example, although the federal statute does not include any modes of transportation under its definition of the phrase, see 42 § U.S.C. 2000a(b), the NYCRL does, see N.Y. Civ. Rights Law § 40. Thus, the fact that an aircraft may not be considered a place of public accommodation under Section 2000a does not necessitate a similar finding under the NYCRL.

18

N.Y. Civ. Rights Law § 40.  Section 40 defines "place of public
accommodation" as including "all public conveyances, operated on
land or water . . . ."  The fact that NYCRL § 40 does not include
public conveyances operated in the air indicates that airplanes
are not deemed to be places of public accommodation under the
statute.  Furthermore, under a similar statute, New York
Executive Law ("Executive Law") § 296,[10] the definition of "a
place of public accommodation" specifically includes public
conveyances operated in the air.  See N.Y. Exec. Law § 292
(defining the term "place of public accommodation" as including
"all public conveyances operated on land or water or in the
air"); see also South African Airways v. New York State Division
of Human Rights, 64 Misc. 2d 707, 709, 315 N.Y.S.2d 651, 652
(Sup. Ct. N.Y. County 1970) (noting that Executive Law 296
"mak[es] it unlawful to discriminate 'directly or indirectly'
against a person because of his race, in a 'place of public
accommodation,' which obviously includes airplanes").  There is
nothing to indicate that a place of public accommodation under
the NYCRL includes an aircraft, and plaintiff fails to assert any

---

[10] Executive Law § 296(2)(a) provides: "It shall be an
unlawful discriminatory practice for any person, being the owner,
lessee, proprietor, manager, superintendent, agent or employee of
any place of public accommodation . . . because of the race,
creed, color, national origin . . . directly or indirectly, to
refuse, withhold from or deny to such person any of the
accommodations, advantages, facilities or privileges thereof
. . . ."

argument to the contrary.  Plaintiff's NYCRL claim is therefore dismissed.[11]

### (4)

### Section 1981

Plaintiff claims that defendant discriminated against him on the basis of ethnicity,[12] in violation of 42 U.S.C. § 1981 when Delta refused to permit him to carry on his merchandise bag. Defendant argues, however, that plaintiff's Section 1981 claim should be dismissed because he is unable to show intentional discrimination.  Section 1981 provides, in pertinent part, that

---

[11] Alternatively, although never argued by defendant, dismissal of plaintiff's NYCRL claim is also warranted because plaintiff failed to comply with the statute's notice requirement. NYCRL Section 41 "establishes a private cause of action to recover a statutory penalty against those who violate" Section 40 or who aid or incite such a violation.  Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc., 79 N.Y.2d 227, 234, 590 N.E.2d 228, 232, 581 N.Y.S.2d 643, 647 (1992). Section 41 requires that "[a]t or before the commencement of any action under this section, notice thereof shall be served upon the attorney general."  N.Y. Civ. Rights Law § 41.  It is well established that "[t]he failure to comply with the notice provisions of New York Civil Rights Law Article 4 is fatal to a private action under that Article."  Feacher v. Intercontinental Hotels Group, 563 F. Supp. 2d 389, 407 (N.D.N.Y. 2008).  Because there is no indication in the record that plaintiff complied with this pre-requisite, his claim under the statute must be dismissed.

[12] For the purposes of Section 1981, the term "race" includes an individual's ethnicity.  Albert v. Carovano, 851 F.2d 561, 572 (2d Cir. 1988) (citing Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604 (1987)).

"[a]ll persons within . . . the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981.  The right to make and enforce contracts "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).  To establish a claim under Section 1981, "plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)."  Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993) (per curiam).  The parties do not dispute that plaintiff is a member of a racial minority and that the alleged discrimination concerned one of the enumerated activities in Section 1981.  The only element at issue is whether plaintiff can demonstrate intentional discrimination on the part of defendant.

A plaintiff can prove intentional discrimination through either direct or circumstantial evidence.  "Essential to an action under Section 1981 are allegations that the defendants' acts were purposefully discriminatory and racially motivated."

Albert v. Carovano, 851 F.2d 561, 571 (2d Cir. 1988) (en banc) (internal citations omitted).  There is no direct evidence that defendant's decision not to allow plaintiff to carry on his merchandise bag was racially motivated.  Plaintiff, therefore, relies on circumstantial evidence, namely that other passengers, who were white, were permitted to carry bags on the plane.  The Second Circuit has recognized that because proving purposeful discrimination is often difficult, "plaintiffs in discrimination suits often must rely on the cumulative weight of circumstantial evidence."  Norton v. Sam's Club, 145 F.3d 114, 119 (2d Cir. 1998).

The framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), is the procedure most often utilized where the evidence of discrimination is circumstantial.  Fullard v. City of New York, 274 F. Supp. 2d 347, 354 (S.D.N.Y. 2003). Although the McDonnell Douglas burden shifting framework was originally introduced for the purpose of analyzing employment discrimination claims under Title VII, it has been similarly employed by plaintiffs alleging intentional discrimination under Section 1981.  See Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004); see also Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 146 (2d Cir. 1999); Harris v. Allstate Ins. Co., 83 F. Supp. 2d 423, 431 (S.D.N.Y. 2000) ("The adjudication of a discrimination claim pursuant to § 1981 follows the three-step

22

procedure set forth in McDonnell Douglas.").

Under the McDonnel Douglas three-step procedure, the plaintiff bears the initial burden of proving, by a preponderance of the evidence, a prima facie case of discrimination. Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008).  The plaintiff's burden of establishing a prima facie case is "minimal." McPherson v. New York City Dep't of Educ., 457 F.3d 211, 215 (2d Cir. 2006).  Nevertheless, the plaintiff must still identify "circumstances giving rise to an inference of discrimination on the basis" of race.  McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).  "An 'inference of discrimination arises when [an] individual of one race [is] treated less favorably than those of another race who are similarly situated.'"  Drayton v. Toys 'R' U.S., Inc., --- F. Supp. 2d ---, 2009 WL 2170233, at *6 (S.D.N.Y. July 17, 2009) (citation omitted) (alteration in original).

If the plaintiff succeeds in establishing a prima facie case of discrimination, "the burden shifts to the defendant to articulate 'some legitimate, non-discriminatory reason' for its action." Holcomb, 521 F.3d at 138 (quoting McDonnell Douglas, 411 U.S. at 802).  Once the defendant is able to provide such a reason, the plaintiff can no longer rely on the presumption that was raised by the prima facie case.  Id.  Instead, the burden shifts back to the plaintiff to demonstrate that the reasons

offered by the defendant are pre-textual and that defendant's
action was actually motivated by race.  Texas Dep't of Community
Affairs v. Burdine, 450 U.S. 248, 253 (1981) ("[S]hould the
defendant carry this burden, the plaintiff must then have an
opportunity to prove by a preponderance of the evidence that the
legitimate reasons offered by the defendant were not its true
reasons, but were a pretext for discrimination.").  "The ultimate
burden of persuading the trier of fact that the defendant
intentionally discriminated against the plaintiff remains at all
times with the plaintiff."  Holcomb, 521 F.3d at 138.  Therefore,
even if a plaintiff is able to show pre-text, "[t]he court must
examine the entire record to determine if plaintiffs meet their
ultimate burden of persuading the fact-finder . . . that
defendants intentionally discriminated against them on the basis
of their race."  Lizardo v. Denny's, Inc., 270 F.3d 94, 103 (2d
Cir. 2001).

    At the prima facie stage, where, as noted, plaintiff's
burden is de minimus, plaintiff's testimony that other white
passengers were permitted to carry their bags onto the plane is
sufficient to give rise to an inference of race-based
discrimination.  Defendant argues that "plaintiff's vague and
casual observations that other passengers had brought carry on
luggage on the [sic] board the aircraft fails to provide any
evidence of national origin discrimination."  Def.'s Mem. of Law

24

for Summ J. ("Def.s' Mem.") at 11.  It is well established,
however, that "[a] plaintiff may support an inference of race
discrimination by demonstrating that similarly situated
[individuals] of a different race were treated more favorably."
Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir.
1999).  Although those individuals with whom plaintiff compares
himself "need not be identical, . . . there should be a
reasonably close resemblance of facts and circumstances."
Lizardo, 270 F.3d at 101 (citing Graham v. Long Island R.R., 230
F.3d 34, 40 (2d Cir. 2000)).  Delta never contends that plaintiff
was not similarly situated to the other passengers on the plane.
Moreover, there is evidence in the record that other passengers
on plaintiff's flight were similarly situated.  Specifically,
plaintiff testified that the other white passengers on the plane
were carrying bags that were similar in size to his merchandise
bag and that his bag met Delta's carry on size requirement.
Based on the minimal showing required at this stage, with all
evidence being viewed in the light most favorable to plaintiff,
plaintiff has brought forth sufficient circumstantial evidence of
racial discrimination to defeat summary judgment.  See, e.g.,
Trigueros v. Southwest Airlines, No. O5-CV-2256, 2007 WL 2502151,
at *4 (S.D. Cal. Aug. 30, 2007) (finding that plaintiffs made out
a prima facie case of discrimination by testifying that they were
taken off the airplane and admonished when they refused to move a

25

stowed carry-on bag when a similarly situated Caucasian woman was not removed from the plane after she refused to move her bag).

In response to plaintiff's prima facie case, defendant fails to articulate a legitimate, non-discriminatory reason for not allowing plaintiff to carry on the merchandise bag.[13]  The Second Circuit has found that "[a]ny legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case."  Fisher v. Vassar Coll., 114 F.3d 1332, 1335-36 (2d Cir. 1997), abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146 (2000).  Thus, all defendant had to do was bring forth some legitimate, non-discriminatory explanation for its conduct.  The only explanation provided by defendant for why it might have required plaintiff to check in his merchandise bag was "that Delta has the discretion to

---

[13] Defendant does bring forth two non-discriminatory reasons for other actions.  However, these explanations cannot rebut plaintiff's prima facie case because they focus on conduct that is wholly separate from the acts that plaintiff alleges were discriminatory.  First, defendant explains that the reason Hall told plaintiff that he was required to check in his bag was that "it was her understanding at that time that a selectee could not bring carry-on luggage on board the aircraft."  Def.'s Reply Mem. of Law in Support of Summ J. Mot. ("Def.'s Reply") at 8.  This only establishes a legitimate, non-discriminatory explanation for why Hall believed that plaintiff could not carry on his luggage.  Defendant, however, denies that plaintiff was ever required to check in his bag.  Defendant also provides a reason for subjecting plaintiff to a hand-search of his bag, arguing that the search was required because plaintiff was designated as a "selectee" under the federal security framework that was put in place for all air carriers.  Plaintiff, however, never alleges that the security screening, which required his bags to be hand-searched, was racially motivated.

restrict or limit a passenger's carry-on luggage." Def.'s Mem.
at 10.  Delta may very well have such discretion, but defendant
offered no legitimate, non-discriminatory explanation for why it
exercised that discretion to restrict plaintiff's carry on
privilege while not preventing other passengers from carrying on
their bags.  Ultimately, defendant is unable to offer a non-
discriminatory reason for its conduct because defendant denies
that it ever prevented plaintiff from carrying his merchandise
bag on board.  As such, a material issue of fact exists, namely
whether the alleged discriminatory act ever took place.  Assuming
that plaintiff was indeed forced to check his merchandise bag,
plaintiff has established a prima facie case and defendant has
failed to meet its burden at the second stage of the <u>McDonnel
Douglas</u> analysis.  Defendant is thus not entitled to summary
judgment on plaintiff's Section 1981 claim.[14]  <u>See, e.g.</u>, <u>Feacher
v. Intercontinental Hotels Group</u>, 563 F. Supp. 2d 389, 403
(N.D.N.Y. 2008) (denying summary judgment where defendants failed

---

[14] Defendant also argues that plaintiff's discrimination
claim should be dismissed because there is no evidence that
plaintiff suffered any damages as a result of the alleged
discrimination.  It is well established, however, that a
plaintiff need not have suffered an actual loss as a result of
the discrimination in order to bring an action under Section
1981.  <u>Tolbert v. Queens Coll.</u>, 242 F.3d 58, 74 (2d Cir. 2001)
(reinstating a jury's award of punitive damages and awarding the
plaintiff nominal damages in an action alleging violations of
Title VI and Section 1981, finding that "[e]ven if the plaintiff
fails to persuade the jury that the proven violation caused him
an injury that is compensable, the defendant who committed the
violation is not entitled to judgment as a matter of law.").

to provide a legitimate explanation for refusing to serve African American plaintiffs and instead attacked plaintiff's prima facie case by challenging whether the two Caucasian couples that plaintiffs saw entering the restaurant were actually served upon entering); see also Litrel v. County of Suffolk, 02-CV-2410, 2005 WL 2413671, at *7 (E.D.N.Y. Sept. 28, 2005) (finding material facts were at issue where defendants failed to show a legitimate, nondiscriminatory explanation of their action after the burden shifted to them).

### (5)

### Preemption Under The Airline Deregulation Act

Defendant argues that plaintiff's state law tort claims are preempted by the Airline Deregulation Act (the "ADA").[15]  Prior to 1978, airplane passengers were permitted to bring common law

---

[15] Much of plaintiff's opposition is spent arguing that the ADA does not preempt plaintiff's discrimination claims.  See, e.g., Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 13 ("Despite defendants [sic] tortured efforts to characterize its racial discrimination against Mr. Bary as somehow related to an airline service, protecting such conduct is not what Congress envisioned when deregulating the airline industry.").  Defendant, however, concedes this point, acknowledging that it never argued that the ADA preempts plaintiff's civil rights claims.  See Def.'s Reply at 1 ("The plaintiff's opposition memorandum strenuously argues that claims against air carriers pursuant to 42 U.S.C. § 1981 are not expressly preempted.  However, that general point is not in dispute.").  Delta's preemption argument is aimed only at plaintiff's state law tort claims, which have nothing to do with discrimination.  Accordingly, the preemption discussion focuses only on plaintiff's tort claims.

or statutory claims against airlines pursuant to the Federal
Aviation Act (the "FAA").  Rombom v. United Air Lines, Inc., 867
F. Supp. 214, 218 (S.D.N.Y. 1994).  At that time, the Civil
Aeronautics Board (the "CAB") was given the power to regulate the
interstate airline industry.  Am. Airlines v. Wolens, 513 U.S.
219, 222 (1995).  In an effort to loosen the economic regulation
of the domestic airline industry, Congress amended the FAA in
1978 by enacting the Airline Deregulation Act ("ADA").  Air
Transp. Ass'n of Am., Inc. v. Cuomo, 520 F.3d 218, 222 (2d Cir.
2008) (per curiam).  To further its goals, the ADA placed
"exclusive legislative and regulatory authority in the aviation
context in the hands of the federal government."  Weiss v. El Al
Isr. Airlines, Ltd., 433 F. Supp. 2d 361, 369 (S.D.N.Y. 2006),
aff'd, 309 Fed. App'x 483 (2d Cir. Feb. 13, 2009), cert. denied,
129 S. Ct. 2797 (June 15, 2009).  "To ensure that the States
would not undo federal deregulation with regulation of their
own," the ADA included an express preemption provision.  Morales
v. Trans World Airlines, Inc., 504 U.S. 374, 378 (1992); see also
Peterson v. Cont'l Airlines, Inc., 970 F. Supp. 246, 249
(S.D.N.Y. 1997).

The ADA's preemption provision provides that "a State . . .
may not enact or enforce a law, regulation, or other provision
having the force and effect of law related to a price, route, or
service of an air carrier that may provide air transportation

29

. . . ."   49 U.S.C. § 41713(b)(1).   The Supreme Court has
interpreted this broadly, finding that the statute meant to
preempt any state action "having a connection with, or reference
to, airline rates, routes, or services."  Morales, 504 U.S. at
384.   On the other hand, state actions that are "too tenuous,
remote, or peripheral a manner to have pre-emptive effect," are
not subject to preemption.   Id. at 390 (internal quotation mark
omitted).

In determining whether a state law claim concerning an
alleged airline service is preempted by the ADA, numerous
district courts in this circuit have adopted the three-part test
established in Rombom v. United Air Lines, Inc., 867 F. Supp. 214
(S.D.N.Y. 1994) (Sotomayor, J.).  See Farash v. Continental
Airlines, Inc., 574 F. Supp. 2d 356, 363 (S.D.N.Y. 2008) ("To
assess whether a tort claim should be preempted, courts in the
Southern District have generally applied the three-part test
articulated in Rombom."), aff'd, 2009 WL 1940653 (2d Cir. Jul 02,
2009).   Under the Rombom test, a court must first determine
whether "the activity at issue in the claim is an airline
service."  Id. at 221.   If the activity is an airline "service"
then the court must decide whether the plaintiff's claim affects
the airline service "directly or tenuously, remotely or
peripherally."  Id. at 222.   If the "specific state tort claim
has only an incidental effect on a service, there is no

30

preemption and the state tort action should continue."  Id.
Third, the court looks to see whether "the underlying tortuous
conduct was reasonably necessary to the provision of the
service."  Id.  "If the tortuous act did not occur during the
service . . . or did not further the provision of the service in
a reasonable manner, then the state tort claim should continue."
Id.  This final prong of the Rombom test "has been applied only
to exempt from preemption actions that are 'outrageous or
unreasonable,'"  Weiss, 471 F. Supp. 2d at 361 (quoting Rombom,
867 F. Supp. at 223).

    An analysis under the three-part Rombom test reveals that
plaintiff's state law tort claims are preempted by the ADA.  At
"[t]he first prong of the Rombom test . . . the determination of
service rests heavily on the extent to which the activity in
question is ordinary and relates directly to air travel."  Id. at
361.  The activity at issue here, the handling of plaintiff's
checked-in merchandise bag, is clearly "ordinary and relates
directly to air travel," as it is usual for passengers to bring
luggage with them when traveling and it is a customary practice
for airlines to check that luggage.  Furthermore, although not
addressing the specific issue of whether baggage handling is an
airline service subject to preemption, the Second Circuit has
noted that "[a] majority of the circuits to have construed
'service' have held that the term refers to the provision or

anticipated provision of labor from the airline to its passengers and encompasses matters such as boarding procedures, baggage handling, and food and drink-matters incidental to and distinct from the actual transportation of passengers." Cuomo, 520 F.3d at 223 (holding "that requiring airlines to provide food, water, electricity, and restrooms to passengers during lengthy ground delays does relate to the service of an air carrier and therefore falls within the express terms of the ADA's preemption provision.") (emphasis added); see, e.g., Hodges v. Delta Airlines, Inc., 44 F.3d 334, 336 (5th Cir. 1995) (en banc) (defining "service" broadly as contractual features of air transportation, including "ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself"); Koutsouradis v. Delta Air Lines, Inc., 427 F.3d 1339, 1343 (11th Cir. 2005) (acknowledging that the Eleventh Circuit "has adopted the Fifth Circuit's definition of 'service' for ADA preemption purposes to include boarding procedures and baggage handling.") (citing Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1257 (11th Cir. 2003)).[16]

   With regard to the second prong of the Rombom test,

---

[16] The Ninth Circuit, on the other hand, has explicitly held that baggage handling is not included in the definition of "service." Charas v. Trans World Airlines, Inc., 160 F.3d 1259, 1265-66 (9th Cir. 1998) (en banc) (holding that "service" refers to "such things as the frequency and scheduling of transportation" and "the selection of markets," but not "the safe handling and storage of luggage").

plaintiff's claims, which allege the negligent handling of his checked luggage, directly, as opposed to remotely or tenuously, affect the airline's baggage handling service.  See <u>Malik v. Cont'l Airlines Inc.</u>, 305 Fed. App'x 165, 169 (5th Cir. 2008) ("[W]e fail to see how permitting airline passengers to bring state tort claims based on lost luggage (however it came to be lost) can be characterized as 'remotely' connected to baggage handling services.  Such claims strike at the very heart of a 'service' that Congress intended to protect from state regulation.").  Finally, the loss of plaintiff's personal items allegedly transpired while Delta was providing the baggage handling service and plaintiff has presented no evidence demonstrating that the service was unreasonably performed. Plaintiff speculates that the jewelry in his merchandise bag might have been stolen by defendant's employees.  Other than these conclusory allegations, however, there is nothing to indicate that Delta's conduct in handling his merchandise bag was either "outrageous or unreasonable."  Plaintiff's state law tort claims are thus preempted by the ADA.

Plaintiff's claim for the loss of his jewelry should be determined under federal common law.  In analogous cases concerning liability of air carriers for lost or damaged shipments, the Second Circuit has explicitly held that federal common law controls.  <u>Nippon Fire & Marine Ins. Co. v. Skyway</u>

Freight Sys., Inc., 235 F.3d 53, 59 (2d Cir. 2000) (finding "that
federal common law continues to control the issue of liability of
air carriers for lost or damaged shipments even after
deregulation.").  Courts in other circuits have similarly held
that federal common law provides a remedy for claims based on
lost or damaged shipments or checked baggage.  See, e.g.,
Read-Rite Corp. v. Burlington Air Express, Ltd., 186 F.3d 1190,
1195 (9th Cir. 1999) ("[F]ederal common law applies to loss of or
damage to goods by interstate common carriers by air."); see also
Sam L. Majors Jewelers v. ABX, Inc., 117 F.3d 922, 925-29 (5th
Cir. 1997) (holding that a negligence action brought against an
air carrier for loss of goods arose under federal common law);
Malik, 305 Fed. App'x at 170 ("We have recognized that the
federal common law provides airline passenger's with a cause of
action for lost luggage").  Plaintiff's complaint alleges only
state law theories of liability.  Plaintiff is, therefore, given
thirty-five days, from the date of this memorandum and order, to
amend his complaint to allege the specific theory or theories
under which he intends to pursue the federal common law claim or
claims for the loss of his jewelry.


### (6)

**Enforceability of Delta's Baggage Liability Limitation**

According to Delta, even if it is found liable under federal

34

common law for having lost plaintiff's jewelry, its liability should be limited to $2,500 as provided in Section J(1)(A) of its "published" domestic tariff.[17]  Prior to airline de-regulation, "every air carrier" was required to file tariffs with the CAB showing, among other things, "all classifications, rules, regulations, practices, and services in connection with . . . air transportation."  49 U.S.C. § 1373(a) (1982); see also Jacobson v. Delta Airlines, Inc., 742 F.2d 1202, 1206 n.2 (9th Cir. 2001) (quoting 49 U.S.C. § 1373(a) (1976)).  At that time, "tariffs filed with the [CAB] constitute[d] the contract of carriage between airlines and their passengers and, if valid, conclusively and exclusively govern[ed] the rights and liabilities between the parties."  Mao v. Eastern Air Lines Inc., 310 F. Supp. 844, 846 (S.D.N.Y. 1970)); see also Lichten v. Eastern Airlines, Inc., 189 F.2d 939, 940 (2d Cir. 1951) (stating that "[t]o the extent . . . [the tariff] rules are valid, they became a part of the contract under which the appellant and her baggage were carried.").  "[L]imitations of liability in tariffs required to be filed by air carriers with the CAB [we]re binding on passengers and shippers whether or not the limitations [we]re embodied in the transportation documents."  Mao, 310 F.Supp. at 846; see also

---

[17] Although Section J(2)(F) of Delta's domestic tariff excluded liability for jewelry unless excess insurance was purchased, Delta never argues that it is completely free from liability for the loss of plaintiff's jewelry.

Vogelsang v. Delta Air Lines, Inc., 302 F.2d 709, 712 (2d Cir. 1962) (finding, in an action involving lost jewelry, that limitations of liability contained in tariffs filed with the CAB were binding on shippers and passengers).  Thus, an air carrier could achieve limited liability by simply filing a valid tariff containing such a provision.[18]

Beginning on January 1, 1983, however, domestic air carriers were no longer required to file tariffs with the CAB.[19]  See 49 U.S.C. 1551(a)(2)(A) (1982) (abolishing the tariff filing requirement); Wolens, 513 U.S. at 230 (recognizing the "January 1, 1983, termination of domestic tariffs").  Thus, there is no longer a presumption that passengers have constructive notice of the provisions in a domestic air carrier's tariff.  47 Fed. Reg. 52129 (1982) (noting that pursuant to the ADA, after January 1,

_____

[18] The CAB had "primary jurisdiction" over the validity of tariffs, which meant that "a shipper complaining that a carrier's rate, rule, or practice is unreasonable or discriminatory must exhaust the administrative jurisdiction over the subject matter before seeking a judicial determination of the question."  First Pennsylvania Bank, N.A. v. Eastern Airlines, Inc., 731 F.2d 1113, 1120 (3d Cir. 1984).

[19] Airlines, however, are still required to file tariffs with the Department of Transportation ("DOT") for foreign air transportation.  14 C.F.R. § 221.2 (stating that "every air carrier and every foreign air carrier shall file with the Department, and provide and keep open to public inspection, tariffs showing all fares, and charges for foreign air transportation . . . .").

1983, "[c]arriers will no longer be required or permitted to file domestic tariffs for any purpose . . . and those on file as of that date shall have no force or effect."). Today, in order to bind passengers to domestic tariff provisions, an air carrier must provide the requisite notice in some other manner. See Neal v. Republic Airlines, Inc., 605 F. Supp. 1145, 1148 (N.D. Ill. 1985) (noting that although elimination of the tariff-filing requirement meant that "air carriers could no longer presume a shipper's notice of CAB-approved tariffs, it did not bar the carriers themselves from providing shippers with the requisite notice of declared value rates"). Whether Delta can enforce its baggage limitation of liability thus rests on whether plaintiff was given adequate notice of the provision either on or with his ticket.[20] Wells v. Am. Airlines, No. 88 Civ. 5729, 1991 WL

---

[20] In 2001, the rules promulgated by the DOT, the agency that inherited the remaining responsibilities of the CAB, explicitly permitted air carriers to limit their liability for the carriage of baggage to $2,500. See 14 C.F.R. § 254.4 (2001) ("[A]n air carrier shall not limit its liability for provable direct or consequential damages resulting from the disappearance of, damage to, or delay in delivery of a passenger's personal property, including baggage, in its custody to an amount less than $2500 for each passenger."). The regulations also mandated that an airline provide conspicuous written notice either on or with the passenger's ticket regarding the airline's baggage liability limitation or that federal law requires that any limitation be at least $2,500. 14 C.F.R. § 254.5 (2001) ("[A]n air carrier shall provide to passengers, by conspicuous written material included on or with its ticket, either: (a) Notice of any monetary limitation on its baggage liability to passengers; or (b) The following notice: 'Federal rules require any limit on an airline's baggage liability to be at least $2500 per passenger.'"). The regulations permit the DOT to "review the

37

79396, at *4 (S.D.N.Y. May 9, 1991) ("[L]imitations of liability are valid and binding on passengers as part of the contract of carriage where . . . the passenger receives notice thereof either on or with the passenger's ticket.").

In similar actions brought against airlines for lost luggage, several courts have applied the "reasonable communicativeness" test in determining whether a passenger was provided with adequate notice of a baggage limitation of liability.  See, e.g., Gluckman v. Am. Airlines, Inc., 844 F. Supp. 151, 161 (S.D.N.Y. 1994) (applying the reasonable communicativeness test in an action against an air carrier for failing to safely transport a passenger's pet dog); Casas v. Am. Airlines, Inc., 304 F.3d 517, 524 (5th Cir. 2002) (stating, in an action involving lost baggage containing a video camera worth $1,000, that "cases apply a two-step analysis in determining whether liability-limiting provisions are adequately plain and conspicuous to give reasonable notice of their meaning."); Harger v. Spirit Airlines, Inc., No. 01 C 8606, 2003 WL 21218968, at *5 (N.D. Ill. May 22, 2003) (applying the reasonable communicativeness test to a claim by plaintiff that the airline lost a jewelry bag that the airline had forced her to check in

_____

minimum limit of liability prescribed . . . every two years."  14 C.F.R. § 254.6.  Today, the limit is $3,300.  See 14 C.F.R. § 254.4.

and noting that even if the released valuation doctrine applied
that test would also have been met); <u>Huang v. Int'l Total
Services</u>, No. 94-75368, 1997 WL 33377508, at *3-6 (E.D. Mich Apr.
17, 1997) (applying the "reasonable notice" test where passenger
alleged that one of his jewelry cases was stolen while going
through the security checkpoint).

    The Second Circuit explicitly adopted the reasonable
communicativeness test in an action involving the enforceability
of a provision limiting a cruise passenger's time to sue. <u>Ward
v. Cross Sound Ferry</u>, 273 F.3d 520, 524 (2d Cir. 2001). The
general purpose of the reasonable communicativeness standard is
to determine "whether the carrier did all it reasonably could to
inform the passenger that the terms and conditions incorporated
in the ticket were important matters of contract affecting his or
her rights." <u>Gluckman</u>, 844 F. Supp. at 161. The court first
reviews the physical characteristics of the ticket itself,
including "features such as size of type, conspicuousness and
clarity of notice on the face of the ticket, and the ease with
which a passenger can read the provision in question." <u>Deiro v.
Am. Airlines, Inc.</u>, 816 F.2d 1360, 1364 (9th Cir. 1987) (quoting
<u>Shankles v. Costa Armatori, S.P.A.</u>, 722 F.2d 861, 863-64 (1st
Cir. 1983)). The court then examines the circumstances
surrounding the plaintiff's purchase and retention of the ticket.
<u>Id.</u> (citing <u>Shankles</u>, 722 F.2d at 865). Because it is likely

"that a passenger will not read the fine print upon purchase
. . . the surrounding circumstances . . . 'may be of equal
importance as the prominence of warnings and clarity of
conditions in deciding whether a provision should be held to bind
a particular passenger'" Ward, 273 F.3d at 523 (quoting
Shankles, 722 F.2d at 865). "The surrounding circumstances to be
considered include the passenger's familiarity with the ticket,
the time and incentive under the circumstances to study the
provisions of the ticket, and any other notice that the passenger
received outside of the ticket." Deiro, 816 F.2d at 1364 (citing
Shankles, 722 F.2d at 866). Also taken into consideration is
whether the plaintiff is an experienced commercial air traveler.
See Deiro, 816 F.2d at 1365.

    In lieu of the reasonable communicativeness test, other
courts, in factually similar cases, have applied the "released
valuation doctrine." See, e.g., Shapiro v. United Airlines, CV-
88-0950, U.S. Dist. LEXIS, at *7-8 (E.D.N.Y. Aug. 30, 1989)
(applying the release valuation doctrine where the plaintiff
sought damages for the delay of his checked baggage); Feature
Enterprises, Inc. v. Cont'l Airlines, 745 F. Supp. 198, 200
(S.D.N.Y. 1990) (applying the released valuation doctrine in an
action by a jewelry manufacturer against an airline for the loss
of a jewelry case that had been checked in). The Second Circuit
applied the released valuation doctrine in an action involving

lost cargo.[21]  <u>See</u> <u>Nippon Fire & Marine Ins. Co. v. Skyway</u>
<u>Freight Sys., Inc.</u>, 235 F.3d 53, 59-60 (2d Cir. 2000).  Under the
released valuation doctrine, provisions that limit a carrier's
liability for lost or damaged cargo are enforceable as long as
they "(1) are set forth in a 'reasonably communicative' form, so
as to result in a 'fair, open, just and reasonable agreement'
between carrier and shipper; and (2) offer the shipper a
possibility of higher recovery by paying the carrier a higher
rate."[22]  <u>Id.</u>

The only evidence submitted by Delta in favor of binding
plaintiff to its baggage limitation of liability was an affidavit
from Delta's in-house counsel.  Attached to that affidavit were
selected portions of Delta's domestic tariff, including the
provision limiting defendant's liability for lost or damaged
baggage to $2,500.  The affidavit did not indicate whether
plaintiff's airplane ticket or boarding pass explicitly
incorporated the terms of Delta's tariff or even referred to the
tariff, whether the ticket or boarding pass themselves contained

---

[21] In <u>Gluckman</u>, the court indicated that the released
valuation doctrine only applies to claims relating to freight or
cargo and not to airline baggage claims pursued by passengers.
<u>Gluckman</u>, 844 F. Supp. at 161 n. 5.  As indicated <u>infra</u>, it is
not necessary to decide which test applies here.

[22] What is deemed reasonable notice under the reasonable
communicativeness test is likely to also constitute reasonable
notice under the released valuation doctrine.  <u>Deiro</u>, 816 F.2d at
1365 n. 4.  It is thus not necessary to differentiate between the
two standards with regard to the notice requirement.

notice of Delta's baggage liability limitation or whether
plaintiff received any other documents along with his ticket or
boarding pass that may have contained the requisite notice of
Delta's baggage liability limitation.  The affidavit simply
affirmed that Delta's tariff was "published" pursuant to Delta's
business practice.[23]  The affidavit and defendant's arguments
misleadingly imply that Delta published its domestic tariff with
an agency of the federal government and that such publication was
sufficient to place passengers on constructive notice of the
tariff's provisions.  As demonstrated above, however, this is no
longer the case with regard to domestic tariffs.  It is hard to
believe that counsel for Delta Airlines was unaware of the
requirement to provide passengers with notice of its baggage
liability limitation.  Indeed, in a second affidavit, submitted
following further inquiry from this court, Delta appears to
acknowledge its failure to address the existence of "the issue of
Delta's notification to the plaintiff of the incorporated terms
of the contract of carriage and limits of liability in place on
November 8, 2001."[24]  Supplemental Aff. Regarding Tariff ("Supp.
Aff.") ¶ 1.  Delta also acknowledged that it was aware of the
requirement that "all air carriers are to include 'on or with

_____

[23] The affidavit gave no explanation as to what "published"
meant.

[24] Delta's supplemental affidavit does not explain why Delta
failed to reveal this information on its own.

each ticket' a notice of baggage liability limitations." Supp. Aff. ¶ 2. Still, Delta did not produce either plaintiff's airplane ticket, his boarding pass or any other document that may have contained the requisite notice. Such conduct is inexcusable and imposed an unnecessary burden on this court to conduct needless independent research.

It was only at the request of this court that Delta, for the first time, produced an example of a ticket jacket that it claims plaintiff should have received along with his boarding pass. No doubt, this information was available to Delta and Delta was aware of its importance at the time it filed its motion on October 24, 2008.[25] Defendant's failure to have submitted this evidence at that time is unacceptable. Nonetheless, a brief review of the ticket jacket is warranted. The front cover of the ticket jacket does not indicate that the document embodies "important matters of contract affecting [the passenger's] rights." Gluckman, 844 F. Supp. at 161. Although the inside of the ticket jacket notifies passengers of Delta's baggage limitation liability, the notice is contained on the bottom half of the second to last page of the document in small font:

 DOMESTIC - NOTICE OF BAGGAGE LIABILITY LIMITATIONS
 Travel wholly within the 50 United States, Puerto Rico and
 the U.S. Virgin Islands

---

  [25] There is no indication from Hall's deposition whether a ticket jacket was actually provided to plaintiff along with his boarding pass.

43

- Liability is limited to $2,500 per ticketed passenger unless a higher value (for checked baggage) is declared in advance and additional charges are paid
- Excess valuation may not be declared on certain types of articles
- No liability for electronic equipment, photographic equipment, jewelry, cash, computer equipment or other similar valuable items

Additionally, it is only on the last page of the ticket jacket, in a shaded box, that the document mentions anything concerning the incorporation of Delta's tariff:

> NOTICE OF INCORPORATED TERMS
> Air transportation is subject to the individual contract terms (including rules, regulations, tariffs and conditions) of transporting air carriers, which are herein incorporated by reference and made part of the contract of carriage.  Incorporated terms may include, but are not restricted to:
> 1.  Limits on liability for personal injury or death;
> 2.  Limits on liability for baggage, including fragile or perishable goods and availability of excess valuation coverage . . . .

Upon request, plaintiff also submitted additional evidence, including the electronic tickets ("e-tickets") that he had printed directly from the Priceline.com website and a copy of his boarding pass.  Conspicuously, plaintiff only retained three of the e-tickets' five pages.  The first three pages contain no information concerning Delta's baggage limitation of liability.[26] Neither party submitted any evidence regarding the contents of

---

[26] The last page ends with: "You are permitted the same baggage allowance as other economy class passengers.  Since carry-on and checked baggage . . . ."

44

the missing two pages and plaintiff's boarding pass does not refer to Delta's baggage liability limitation.

The surrounding circumstances, by themselves, do not indicate whether plaintiff received adequate notice of the baggage liability limitation. For example, there is no evidence that signs, advertising the baggage liability limitation, were posted at the airport or adjacent to Delta's ticket counter. Although plaintiff was an experienced commercial air traveler, having transported his jewelry on numerous flights, he appears to have had no incentive to familiarize himself with Delta's baggage liability limitation because he intended to carry the merchandise bag on board with him. It is also unclear whether he was familiar with the fact that airlines generally limit their liability in this manner because he claims to have always carried his merchandise bag on board with him. Even assuming that Hall gave plaintiff a copy of the ticket jacket, plaintiff would have only had a few moments to review its contents before being forced to check his bag. Additionally, neither Hall nor any other Delta employee informed plaintiff of the liability limitation or that he had the option of purchasing excess insurance. Indeed, plaintiff testified that he only became aware of the liability limitation and the option of purchasing excess valuation after having consulted with an attorney.

At this time, however, it is not necessary to determine

45

whether plaintiff received adequate notice of the liability
limitation because an issue of fact exists regarding whether
Delta materially breached its tariff by preventing him from
carrying his merchandise bag onto the plane.  If such a breach
occurred Delta would not be permitted to enforce its baggage
liability provision.  See Coughlin v. Trans World Airlines, Inc.,
847 F.2d 1432, 1433 (9th Cir. 1988) (per curiam).
Coughlin involved a suit brought by a passenger against an
airline for losing a checked package containing the cremated
remains of her husband.  Id.  The Ninth Circuit held that by
refusing to allow the plaintiff to carry the package on board,
even though it was well-within the size restriction for carry on
luggage, the airline had breached an express provision in its
tariff that valuables "should be carried personally by the
passenger."  Id.  Under the express terms of the contract, the
plaintiff should have been allowed to carry the cremated remains
on board since they were clearly valuable and there was nothing
to suggest that the carriage of human ashes was prohibited.  Id.
Because the airline materially breached its agreement, the
tariff's limitation of liability provision was deemed
unenforceable.  Id. at 1434 ("It is axiomatic that a material
breach of an agreement warrants rescission. . . . TWA cannot now
attempt to enforce a provision of the contract it has violated.
TWA's refusal to allow [the plaintiff] to protect her valuables

46

by carrying them personally effectively denied her the benefit of her bargain with respect to the tariff agreement.").

The alleged facts in the present action are strikingly similar to Coughlin.  Section J(2)(F) of Delta's domestic tariff provided that "[Delta] is not responsible for jewelry . . ." and directed that jewelry "should be carried by the passenger." Thus, like the tariff provision in Coughlin, Delta's domestic tariff contained "a separate, liability-limitation-related contractual promise, namely a promise that the passenger might personally monitor the safety of the valuables by carrying them in the cabin." Hill Constr. Corp. v. Am. Airlines, Inc., 996 F.2d 1315, 1319 (1st Cir. 1993) (Breyer, C.J.) (discussing the contract provision at issue in Coughlin).  Similar to the plaintiff in Coughlin, plaintiff here alleges that Delta's ticketing agent forced him to check his merchandise bag even though it contained valuable jewelry and despite the fact that it was within Delta's carry on size restriction.[27]  Although Delta claims that it never forced plaintiff to check his merchandise bag, the evidence is to be viewed in the light most favorable to plaintiff.  An issue of fact, therefore, remains as to whether Delta materially breached its own tariff.  Accordingly, the

---

[27] Delta does not contest that plaintiff's merchandise bag met the airline's carry on size requirement.  Additionally, at her deposition, Hall acknowledged that plaintiff informed her that his bag contained jewelry.  Hall Dep. at 40-41.

47

enforceability of Delta's baggage liability limitation cannot be determined on summary judgment.  <u>See, e.g.</u>, <u>Harger</u>, 2003 WL 21218968, at *8 (denying summary judgment on plaintiff's breach of contract of carriage claim where there was an issue of fact concerning whether the airline refused to permit the plaintiff to check in her baggage because it did not meet the carry on size requirement and finding that "[i]f . . . [the plaintiff's] bag met the specific size requirements under the contract of carriage but Spirit refused to allow [the plaintiff] to carry it on, then Spirit materially breached its contract of carriage and it cannot enforce the liability limitation against [the plaintiff].").

**(7)**

**Limiting Plaintiff's Damages**

Alternatively, Delta argues that even if its liability is not limited to $2,500, plaintiff's damages should be limited to $13,847.76 because this is the only amount of money that plaintiff expended as a result of the loss of the jewelry.  In support of its argument defendant submitted copies of four checks made out by Bary Gems, Inc. totaling $2,748.88 and eleven checking deposit slips totaling $11,098.88.  Defendant claims that this is the only evidence of the payments that plaintiff made to his vendors to reimburse them for the lost merchandise. Plaintiff does not contest this assertion.  The $13,847.76

figure, although representative of plaintiff's current out-of-pocket costs, is not indicative of the amount that plaintiff is still responsible for re-paying.  Indeed, plaintiff testified that he only gave his vendors as much money as he could afford, and that the $13,847.76 represents less than 5% of what he still owes them.  Bary Dep. at 153, 157.  Although plaintiff's vendors have yet to bring suit against him, plaintiff has made it fairly clear that his vendors still expect to be paid for the lost jewelry.  Thus, the checks and checking deposit slips that defendant introduced do not conclusively demonstrate that plaintiff's damages should be limited to $13,847.76.[28]

---

[28] Some of the jewelry that plaintiff allegedly lost consisted of items that were owned by plaintiff himself and that he valued at $1,140.80.  Bary Dep. at 64-65.

**Conclusion**

Defendant's motion for summary judgment is granted with regard to plaintiff's state law tort claims, which are preempted by the ADA, and plaintiff's Title VI and NYCRL claims. Defendant's motion for summary judgment is denied with regard to plaintiff's Section 1981 claim and the enforceability of defendant's baggage liability limitation. Plaintiff may pursue any claim he may have for the loss of his jewelry under federal common law. Plaintiff is given thirty-five (35) days from the date of this memorandum and order to amend his complaint to specify the theory or theories that he intends to pursue under federal common law.


Dated:      Brooklyn, New York
            October 9, 2009


                              SO ORDERED:


                              _____/S/_____
                              David G. Trager
                              United States District Judge